JOHN S. LOGAN

*v.*

JOHN O'LEARY.

Where A determined to make default in the performance of a contract with
B, and, in anticipation of recovery against him, because of the breach of his
engagement, hurriedly sold and converted into money all his estate, which
consisted of mortgages, promissory notes, chattels and land, and, when after-
wards examined before a master, under the statute (*Rev. p. 121 § 90*), gave an
incredible account of his disposition of such moneys—but the same time was
shown to have been making inquiry for opportunities to invest about the sum
he had realized upon such conversion—it will be presumed that he has suffi-
cient moneys in his possession to pay the judgment which B has recovered
against him, and which amounts to about one-fifth of the sum which he real-
ized as aforesaid, and he will be decreed to pay the judgment.

---

On September 10th, 1885, the defendant entered into a con-
tract in writing with the complainant by which he agreed to
purchase from the complainant a farm in Burlington county, for
$12,596, and pay therefor, on March 25th, 1886, when the deed
was to be delivered, $6,000 in cash, and $6,596 by his bond,
payable in five years, secured by a mortgage upon the farm.   It
was also agreed in the contract that if the defendant should fail

to carry out the agreement on his part, that he should forfeit to the complainant $1,000. About the time this contract was made, the defendant proposed to the complainant that he would assign to him, in part payment of the $6,000 cash, two mortgages which he held against one Ridgeway, amounting together to $3,000, and at the same time told the complainant that he was worth about $6,000, and also owned a horse and wagon, some cattle, and seventeen acres of timber land.

Soon after the contract was signed, the complainant sold out his stock upon the farm, discharged his tenant, and put the defendant in possession of the place.

About December 3d, 1885, the defendant conveyed his wood land to his nephew, John Stumph, Jr., for $395.75, and about four days later assigned the Ridgeway mortgages to a Mrs. Conover. He was in so much haste to procure the money for these mortgages that he would not wait until February 1st, when Mrs. Conover expected to have some money paid to her, but took her note for the principal of the mortgages, endorsed it, and had it discounted, realizing $2,984 for it. Three days later he gave to one Patrick Gleason a chattel mortgage for $250 on his horse, wagon and cow. Three days later still, he required a man named Hoffman to pay him a mortgage of $700, and about the same time he collected from one Collum a note of $300, and assigned to his nephew, John Stumph, Jr., a note of one Gaskell for $585.34. On the 11th of January he let it be known that he would not comply with his agreement to purchase the farm. On the 25th day of March he made a default in the performance of his part of the contract. Within a few days, after this default, the complainant sued him in the supreme court of this state for damages for breach of the contract. The defendant contested the suit, but judgment was entered against him, on November 3d, 1886, for $1,048 and thereupon execution was issued to the sheriff of Burlington county. This execution was returned by the sheriff, unsatisfied, on the 6th of the same month. On the same day the complainant filed his bill in this suit for discovery and relief. On the 5th of November the defendant sold his horse and wagon and some other personal property at public

auction, háving advertised the sale in his wife's name and given out that the property belonged to her.

The defendant was examined by order of this court, under the statute (*Rev. p. 121 § 90*), before a master, and subsequently filed his answer to the bill. The case is now heard upon the bill, answer, deposition of the defendant before the master, and other proofs.

*Mr. Joseph H. Gaskill,* for the complainant.

*Mr. Jacob C. Hendrickson,* for the defendant.

THE CHANCELLOR.

The deféndant, in his examination, admits the hurried conversion of his woodland, notes and mortgages into cash, at about the commencement of the year 1886, but seeks to cause it to be believed that he did so for the purpose of paying some creditors, who were pressing him for satisfaction of their claims. When he was questioned in regard to those creditors, and the payments he made to them, he stated that his wife had made $1,300 or $1,400 by sales of poultry, eggs &c., during years past, upon the farms on which they lived, which moneys he had invested in his name. He says that she demanded this money, and that he had paid her the amount she claimed, which was in the neighborhood of $1,300 or $1,400. He cannot remember the exact amount. He also states that he repaid about $500, he had borrowed from a man who had once worked for him, but whose name he could not accurately recall. He says that prior to the payment he had not seen the man for a year or two; that he did not know where the man came from to get his money, or where he went to after he got it. He claims to have owed moneys at stores, but, although living in a small country place, he fails to remember at what stores he was indebted, or what were the amounts he owed. The bare perusal of his testimony abundantly satisfies me that his explanation, as to the disposition of the money he so hurriedly collected, is a tissue of falsehood from beginning to end.

It is not only contradictory, but is at variance with all rules by which the ordinary business affairs of men are governed.

The proofs show that he was a tenant farmer upon a small scale, and in manner of living was scarcely above the condition of the common laborer. By years of industry and saving he had accumulated the moneys that he now claims to have so quickly and recklessly paid out. It is incredible that a man who still pursues industrious habits and temperate living, as this man does, should have thus expended the entire accumulations of his life.

But the proofs also show that, after the conversion of his property into cash, and within a short time before the filing of the bill in this cause, he made inquiry for opportunities to invest $5,000 or $6,000, alleging that he desired to make investments for his nephew, John Stumph, Jr.

I cannot but be satisfied that he converted his property into money in anticipation of the judgment for which satisfaction is now sought, and that he is now in possession or control of sufficient moneys to pay the judgment.

I will decree that he shall pay the judgment, and the costs of this suit, out of such moneys.